IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

RUSSELL LLOYD POTTER,
ALVERTA VANESSA DAVIS,
PROGRESSIVE NORTHERN INSURANCE CO.,
and
STATE FARM MUTUAL AUTOMOBILE INSURANCE CO.,

        **Plaintiffs,**

    **v.**                                    Civil Action No. 2:15cv266

AMERICAN ALTERNATIVE INSURANCE
CORPORATION,
and
HNH VIRGINIA, INC. D/B/A HAND 'N HEART,

        **Defendants.**

## OPINION AND ORDER

This insurance-related action stems from a car accident between Plaintiffs Russell Lloyd Potter ("Potter") and Alverta Vanessa Davis ("Davis"). It comes before the Court following a two-day bench trial on Potter's declaratory judgment action, which seeks a declaration of the parties' rights and obligations. Specifically, the parties dispute whether Defendant American Alternative Insurance Corporation ("AAIC"), which issued a claims-made professional and general liability policy to Davis's employer, Defendant HNH Virginia, Inc. d/b/a Hand 'N Heart ("HNH"), should afford excess liability coverage to Davis for the accident. Following the bench trial, the Court took this matter under advisement. The Court now sets forth its findings of fact and conclusions of law, thereby resolving all outstanding issues in this matter, and enters judgement in favor of AAIC.

## I. Jurisdiction

This Court possesses removal jurisdiction pursuant to 28 U.S.C. § 1441. On September 8, 2015, this Court granted AAIC's unopposed Motion to Realign the Parties. Doc. 23. The Court ordered that Davis, Progressive Northern Insurance Co. ("Progressive"), and State Farm Mutual Automobile Insurance Co. ("State Farm") be considered Plaintiffs. Id. at 5. Because HNH represents a nominal party, the Court must disregard its citizenship for purposes of diversity jurisdiction. See Doc. 23; see also Navarro Sav. Ass'n v. Lee, 446 U.S. 458, 461 (1980). Since the amount in controversy exceeds $75,000.00, realigning the parties endowed this Court with diversity jurisdiction, as it established complete diversity of citizenship between Plaintiffs Potter, Davis, Progressive, and State Farm and Defendant AAIC. See 28 U.S.C. §§ 1441, 1332.

## II. Factual Findings

### A. The Accident

On December 28, 2012, at approximately 1:00 p.m., Potter and Davis were involved in a car accident on Little Neck Road in Virginia Beach, Virginia. The accident occurred when Davis attempted to exit a parking lot and turn on to Little Neck Road. However, when she started to exit the parking lot, her vehicle struck the side of Potter's vehicle. Potter is seeking $500,000.00 compensatory damages in state court. It is undisputed that Davis owned the vehicle she was driving at the time of the accident. At that time, Davis worked as a companion aide for HNH, a home care agency. Potter did not sue HNH in the underlying state-court lawsuit.

Davis's Provider Aide Record, or timesheet, reveals that she worked from 9:00 a.m. to 11:30 a.m. on December 28, 2012. See Pl. Ex. 8. On the Provider Aide Record, Davis checked that she performed the following tasks on December 28, 2012: clean kitchen/wash dishes,

make/change bed linen, and listing supplies/shopping. Id. Davis testified that, at the time of the accident, she had just picked up medication from the pharmacy for a client, Maxine Cole. After the accident, Davis called HNH and spoke to a receptionist named Kayla, who informed Davis that no one at HNH would be able to deliver the medication to Ms. Cole. Therefore, after the accident, Davis's brother, William Jones, drove Davis to Ms. Cole's home so that Davis could deliver the medication. Davis's call to HNH apparently went unreported, and Mary Gavin ("Gavin"), HNH's Vice President of Operations, did not learn of the accident until after Potter instituted the underlying lawsuit against Davis.

Davis testified that obtaining the medication constituted a "favor," as she had clocked out of work for the day and since she needed to perform errands for herself anyway. She described the errand as "personal." She clarified that her duties were encompassed by the two and one-half hours she spent on the job on December 28, 2012. She differentiated this situation from a situation in which she ran an errand for a client during her designated work hours, noting that "that would be like on the job." Indeed, Davis testified that when she first told Gavin that she had been sued due to a car accident, she did not originally believe HNH had been implicated, because the accident occurred on her own time when she was running personal errands and merely performing a favor for a client.

### B. Companion Aides' Duties

HNH's Companion Aide Job Description lists companion aides' duties as the following: housekeeping, meal preparation and serving meals; wash and dry dishes; daily interaction with client and client family; completion of monthly in-service training programs; compliance with Hand 'n Heart universal precautions; is on time for client assignments as scheduled and/or provides at least 24 hours advance notice of cancellation. Def. Ex. 2. HNH does not limit

3

companion aides' duties to those described in the job description. Indeed, it presumably allows its companion aides to perform errands such as grocery shopping. See Pl. Ex. 8. Employees are not to work more than six (6) minutes after their scheduled quitting time without a manager's approval. See Def. Ex. 3 at 19–20. Their timesheets must be submitted without error. Id.; see also Def. Ex. 7. HNH's written Medication Administration Policy Statement 9.4 ("Statement 9.4") does not allow staff members to transport clients' medications to clients "except in extenuating circumstances," see Def. Ex. 4, though Gavin testified that she could think of no set of circumstances in which she would allow an employee – even a registered nurse – to retrieve a client's prescription.

Evidence exists that HNH did not enforce its written policies. For example, even though Gavin eventually became aware that Davis claimed she picked up medication for Ms. Cole, see Pl. Ex. 13, and even though Davis reported the fact that she was in possession of medication to HNH on the day of the accident, Gavin never disciplined Davis for her alleged infraction. Gavin testified that she did not discipline Davis because she did not know whether to believe Davis's claims concerning the medication, especially considering the fact that Davis already had informed Gavin that the accident did not involve HNH and that records included no incident report detailing Davis's call to HNH on the day of the accident. However, even if Gavin truly disbelieved Davis, Gavin still failed to reprimand Davis for lying about her activities on the day of the accident. If Davis's statements concerning the medication were true, then Davis not only violated Statement 9.4, but she also worked outside of her reported shift. Yet, Davis never received a reprimand. On the contrary, HNH promoted her to a personal care aide.

## C. Relevant Insurance Policies

Progressive issued a personal automobile liability policy to Davis's husband with a per person liability limit of $25,000. Progressive has made an irrevocable offer of $25,000 to settle Potter's claims in the underlying lawsuit, and it is providing Davis with a defense in that suit. State Farm issued a personal automobile liability insurance policy to Potter. This policy affords up to $250,000 in Underinsured Motorist Coverage. AAIC issued a claims-made professional and general liability policy to HNH, Policy #: VHHH-HG-3052431-06. The AAIC policy is at issue in this declaratory judgment action.

Specifically, and in relevant part, the AAIC policy contains an endorsement that provides coverage for "bodily injury" or "property damage" "arising out of the use of a 'non-owned auto,' by you or your 'employees' or 'volunteer workers' in the course of your business operations," where "you" refers to HNH. See Doc. 61, Ex. E-3. The endorsement defines a "non-owned auto" as

> any "auto" you do not own, lease, hire, rent, or borrow which is used in connection with your business operations. This includes "autos" owned by your "employees", your "volunteer workers", your partners or your "executive officers", or members of their households, but only while used in your business operations. "Non-owned auto" also includes any "auto" owned by your patient or client but only while used in connection with your business operations by your "employee" or your "volunteer worker".

Doc. 61, Ex. E-3. In addition, the endorsement contains a section detailing **WHO IS AN INSURED**, which states:

> Each of the following is an insured under this insurance to the extent set forth below:
> 1. You.
> 2. With respect to a "non-owned auto", any partner or "executive officer" of yours, but only while the "non-owned auto" is being used in your business operations.
> 3. Any other person or organization while using a "hired auto" or a "non-owned auto" with your permission, but only if their use is within the scope of your

5

permission. With respect to "loading and unloading", only you or your "employees' [sic] or "volunteer workers" are insured.
4. Any other person or organization, but only with respect to their liability because of acts or omissions of an insured under paragraphs 1., 2. or 3. above.

None of the following is an insured:
1. Any person engaged in the business of his or her employer with respect to "bodily injury" to any co-"employee" or co-"volunteer worker" of such person injured in the course of employment;
2. If you are an individual, you with respect to any "auto" owned by you or a member of your household.
3. Any partner or "executive officer" with respect to any "auto" owned by such partner or officer or a member of his or her household;
4. Any person while employed in or otherwise engaged in performing duties related to the conduct of an "auto business", other than an "auto business" you operate;
5. The owner or lessee (of whom you are a sublessee) of a "hired auto" or the owner of a "non-owned auto" or any agent or "employee" of such owner or lessee;
6. Any person or organization with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

Doc. 61, Ex. E-3.

### III. LEGAL CONCLUSIONS

The issue in this case involves whether the AAIC insurance policy provides excess liability coverage to Davis for the accident that occurred on December 28, 2012. In order for the policy to provide coverage, the Court would have to find that Davis qualifies as an insured under the endorsement[1] and that Potter's injury arose out of Davis's use of a non-owned auto in the course of HNH's business operations. The Court **FINDS** that the AAIC insurance policy does

---

[1] The Court does not reach this issue. However, the Court notes that in order to determine that Davis falls within the **WHO IS INSURED** section of the AAIC policy endorsement, it would have to find that the endorsement is ambiguous, that Davis used her vehicle with HNH's permission and within the scope of that permission, and that Davis's vehicle represents a "non-owned auto" as defined in the policy. Firstly, "a named insured generally cannot give permission to use a vehicle that the named insured does not own." Pham v. Hartford Fire Ins. Co., 419 F.3d 286, 291 (4th Cir. 2005) (quoting Stone v. Liberty Mutual Ins. Co., 478 S.E. 2d 883, 886 (Va. 1996)) (internal quotations omitted). Furthermore, the exclusions in this endorsement appear to be a conglomerate of add-ons to cover situations that have occurred during the policy's life. Part of the endorsement is ambiguous, part is conflicting, and virtually all is illusory. Indeed, the parties did not even raise the issue of whether Davis could be considered an insured under the laws of agency until the morning of trial, presumably due to the endorsement's tortured language. The Court hopes future insureds and courts will not have the interpretation of this policy form inflicted upon them.

not provide excess liability coverage to Davis because the accident and resulting injuries did not arise during the course of HNH's business operations. Thus, the alleged insured – here, Davis – has failed to meet her burden of bringing herself within the AAIC policy.

Because this action is before this Court under its removal and diversity jurisdiction, state substantive law applies. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). As a federal court sitting in Virginia, this Court must apply Virginia choice-of-law rules. See, e.g., Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496–97 (1941). Under Virginia law, a contract is "governed by the law of the place where it is made, unless it is to be performed in another place . . ." Erie Ins. Exchange v. Shapiro, 248 Va. 638, 640 (1994). Here, although the "AAIC policy was delivered to the Named Insured, 'HNH Virginia, Inc.' at an address in Eastern Maryland, where the company's president resides, . . . HNH conducts all of its home health operations in Virginia, and the AAIC Policy was intended to be performed in Virginia." Doc. 37 at 9 (citing Doc. 9, Ex. 2); see also Doc. 61, Ex. E. Therefore, Virginia law governs this contract's interpretation.

In Virginia, courts interpret insurance contracts no differently than other types of contracts. See, e.g., State Farm Fire and Cas. Co. v. Walton, 244 Va. 498, 502 (1992). The insured bears the burden of proving that an insurance policy provides him or her with coverage. See, e.g., Maryland Cas. Co. v. Cole, 156 Va. 707, 716 (1931). However, the insurance company possesses the burden of proving that an exclusionary provision applies. See, e.g., U.S. Life Ins. Co. v. Mason, 214 Va. 328, 330 (1973). When asked to interpret insurance provisions, courts begin by analyzing the words of the contract, giving "the words used in [the] policy their ordinary and usual meaning when they are susceptible of such construction." Walton, 244 Va. at 502. Additionally, courts "must read the terms of the policy as part of the document as a whole,

not in isolation." Gates, Hudson & associates, Inc. v. Federal Ins. Co., 141 F.3d 500, 502 (4th Cir. 1997) (quoting Nationwide Mut. Ins. Co. v. Akers, 340 F.2d 150, 154 (4th Cir. 1965)) (internal quotations omitted). If the contract is unambiguous, courts apply the plain meaning as written. See, e.g., Virginia Farm Bureau Mut. Ins. Co. v. Williams, 278 Va. 75, 81 (2009). However, "if disputed policy language is ambiguous and can be understood to have more than one meaning, [courts] construe the language in favor of coverage and against the insurer." Id. (collecting cases). Specifically, "because insurance policies usually are drafted by insurers, [courts] construe ambiguous policy language purporting to exclude certain occurrences from coverage most strongly against the insurer." Id. Yet, courts have stressed that "reasonable exclusions to coverage, when stated in the policy in clear and unambiguous language that is clearly applicable to a specific situation at hand, will be enforced." Allstate Ins. Co. v. J.A.D. Coal Co., Inc., No. 2:05-cv-00029, 2006 WL 2381880, at *3 (W.D. Va. Aug. 16, 2006).

Here, the Court **FINDS** that Potter's injuries did not arise out of Davis's use of a "non-owned auto" in the course of HNH's business operations. Neither Virginia courts nor federal courts in this district have addressed an insurance policy limiting coverage to employees acting in the course of their employers' business operations. However, several courts have considered policies that incorporate substantially similar language. For example, in Pham v. Hartford Fire Ins. Co., the United States Court of Appeals for the Fourth Circuit considered an insurance policy that limited coverage to employees using "autos" in their employers' business or personal affairs. 419 F.3d 286, 289 (4th Cir. 2005). Similarly, in J.A.D. Coal, the Western District of Virginia analyzed a policy that limited coverage to vehicles used "in connection with [the employer's] business." 2006 WL 2381880, at *4. Courts often examine two factors when interpreting this "in connection with" language: (1) the extent to which the vehicle at issue was

8

used in the course and scope of the insured's business and (2) the extent to which an insured held or exerted a right of control over the vehicle and its driver. See id. at *4–5.

As an initial matter, the endorsement's definition of "non-owned auto" here includes any "auto" "used in connection with [HNH's] business operations . . ." Doc. 61, Ex. E-3. Thus, because ascertaining whether Davis's vehicle represents a "non-owned auto" requires a broader determination than assessing whether Davis used it in the course of HNH's business operations at the time of the accident, the Court will focus on whether Davis acted in the course of HNH's business operations at the time of the accident, as opposed to whether she used her vehicle in connection with HNH's business operations.

Courts examining whether an employee acted in the course of his or her employer's business often look to the scope of the employment as well. See, e.g., Brittingham v. United States, 972 F. Supp. 1014, 1017–18 (E.D. Va. 1997). Performing an act – even a wrongful or illegal act – without an employer's express or implied permission or approval does not necessarily take an employee outside the course of the employer's business operations. See, e.g., Gina Chin & Assocs., Inc. v. First Union Bank, 260 Va. 533, 544–45 (2000). In Gina Chin, for example, the Supreme Court of Virginia held that a bank teller who "violated directives in accepting commercial checks for deposit into a personal account, in failing to obtain a manager's approval to accept high value checks for deposit, and in knowingly accepting checks for deposit with forged endorsements" was not necessarily acting outside the course of his employer's business operations, since "accepting checks for deposit by a bank teller is a service within the ordinary course of First Union's banking business." Id. at 544.

Courts should take an employee's admission that he or she acted outside the scope of his or her employment seriously. Indeed, in Pham, the Fourth Circuit considered whether an

employee who admitted that he caused a car accident "after business hours" was "engaged in [his employer's] business or [his employer's] personal affairs." 419 F.3d at 290. At the time of the accident, the employee in Pham was driving a co-worker back to the company-provided apartments after a night of drinking. Id. at 288. The employer "allowed its employees to drink alcohol on the weekends" and "had a policy of giving its workers [away on business] a cash payment of $105 every Friday evening." Id. The employer also had granted certain employees, including the employee who caused the accident, permission to use their personal cars, which the employee who caused the accident at issue often used to "transport [other] employees to social gatherings." Id. However, because the employee testified that his employer "ha[d] nothing to do with [the accident and that] I was driving my car, after business hours . . . It was something that happened to me when I was off of work," the Fourth Circuit held that, "[b]y his own admission, [the employee] was not acting on behalf of his employer at the time of the accident." Id. at 290. Hence, the employer's insurance policy did not provide coverage to the employee. Id. at 290–91.

Here, Plaintiffs argued that because HNH did not enforce its policy that prohibited companion aides from picking up patients' medications, and since Davis was, in fact, obtaining medication for and on her way to drop off said medication for a client at the time of the accident, Davis was using her vehicle in the course of HNH's business operations when she collided with Potter. Although the issue of whether HNH ever expressly or impliedly permitted Davis to pick up clients' prescriptions is not determinative, see Gina Chin, 260 Va. at 543–45, the Court stresses the ample evidence that HNH does not enforce its own rules concerning the scope of companion aides' duties. For example, the Court credits Davis's testimony that she called HNH shortly after the accident. The fact that the person with whom Davis spoke did not file an

10

incident report does not necessarily imply that Davis never called HNH; rather, it could represent evidence that HNH's receptionist failed to follow proper procedures. Additionally, when HNH representatives did learn of Davis's accident and of her claim that she was transporting medication for a client, see Pl. Ex. 13, they failed to discipline her, despite the company's repeated assertions that it strictly prohibits the transporting of medication by an employee in Davis's position.

However, even if the Court did conclude that transporting medication from the pharmacy to a client's home could constitute a companion aide's duty in the course of HNH's business operations – a question which it need not reach – Davis's characterization of her time here as "off the clock" and as a "favor" compels this Court's decision that she was not using her car in the scope of her employment or in the course of HNH's business operations at the time of the accident. Plaintiffs simply cannot overcome Davis's own testimony that the accident occurred not while she was completing any employment duty but instead while she was performing an off-the-clock favor for Ms. Cole. Just as the employee's testimony in Pham revealed that he did not drive in the course of his employment at the time of his accident, 419 F.3d at 290, Davis's description of her actions at the time of the accident illustrate that she did not act within the course of HNH's business operations. Davis reported that she worked from 9:00 a.m. to 11:30 a.m. on December 28, 2012, see Pl. Ex. 8, and the accident occurred at or around 1:00 p.m. Davis additionally testified that she decided to complete this "favor" for Ms. Cole since she had to go to the stores for herself anyway and since Ms. Cole "is a nice lady." At best, the evidence of whether Davis acted within the course of HNH's business operations represents an equilibrium, so the Court **FINDS** that Plaintiffs have failed to meet their burden of proving that the AAIC policy provides Davis with coverage for this accident.

### IV. JUDGMENT

The Court therefore **FINDS** that Plaintiffs failed to establish that Potter's injuries arose out of the use of Davis's vehicle in the course of HNH's business operations. Davis thus failed to meet her burden of proving that the AAIC insurance policy provides coverage to Davis for this accident. Therefore, the Court **GRANTS** declaratory judgment in favor of AAIC and **FINDS** that the claims-made professional and general liability policy that AAIC issued to HNH, Policy #: VHHH-HG-3052431-06, does not provide coverage to Alverta Davis for the accident that occurred between Davis and Russell Lloyd Potter on December 28, 2012.

The Clerk is **REQUESTED** to send a copy of this order to all counsel of record.

It is so **ORDERED**.

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge

HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, VA
July 8, 2016